IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>vs.<br><br>SCOTTY RODGERS,<br><br>                Defendant. | Case No. 4:23-cr-00022-RRB<br><br>**ORDER**<br>**DENYING MOTION TO SUPPRESS**<br>**(Docket 26)** |

## I. INTRODUCTION

Before the Court is Defendant, Scotty Rodgers, with a Motion to Suppress[1] that is opposed by the Government.[2] An Evidentiary hearing was held in this matter on August 26, 2024, and a transcript of the proceedings was filed.[3] Defendant alleges that he was subjected to an unlawful search and seizure in violation of the Fourth Amendment in that the search constituted an unlawful extension of a *Terry* stop.[4] Defendant further contends that a warrantless search of his car for weapons was performed without probable cause and therefore also was unlawful. The Government contends, however, that Defendant was illegally trespassing on a military installation, that by virtue of being on a military installation he was subject to warrantless searches, and that he consented to any search that did occur.

---

[1] Docket 26.
[2] Docket 30.
[3] Docket 42. Citations to the transcript herein are designated as "Tr. _."
[4] *See Terry v. Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

The Court has reviewed the transcript in detail and has studied all the relevant papers. Moreover, the Court has reviewed the two hours of body camera video filed conventionally.[5] In order to resolve this matter in a timely fashion, the Court hereby rescinds the referral in this matter and resolves the instant motion below.

## II. FACTS

The facts are relatively undisputed. On July 2, 2023, around 9:00 p.m., Federal Wildlife Officer Zachary Arnold[6] and Bureau of Land Management Ranger Jonathan Priday[7] were on patrol in the Donnelly Training Area, which is federal land held in trust by the Bureau of Land Management for the U.S. Army for training.[8] The Twin Lakes, within the Donnelly Training Area, are stocked with fish by the Alaska Department of Fish and Game. When it is open for public recreation, it is a popular camping and fishing location. A permit and associated fee are required to enter the area, and there is an online system used for mandatory check-in.[9] This training area is regularly used by the U.S. military in Alaska for ammunition training, missile training, unit training, and other purposes, and the check-in procedure is in place to make sure civilians are not in the area when training is happening.[10] The main access points are posted with maps and regulation references, with instructions on how to acquire a permit and check in.[11]

---

[5] Government Exhibit 1.
[6] Officer Arnold described his duties as hunting, fishing, trespass, and permit compliance. Tr. 47.
[7] Ranger Priday described himself as a "series 1801 federal police officer." Tr. 7.
[8] Tr. 9.
[9] The recreational access pass obtained through the online portal is formally known as a "Sikes Act Permit," and is referred to by the parties as a "RAP Pass."
[10] Tr. 10.
[11] Id. There also are references to 18 U.S.C. § 1382 on some of the signage. Defense Exhibit B was a picture of the sign adjacent to the area where this matter occurred which stated "military permit required."

*United States v. Rodgers*  Case No. 4:23-cr-00022-RRB
Order Denying Motion to Suppress  Page 2
Case 4:23-cr-00022-RRB-SAO   Document 48   Filed 01/06/25   Page 2 of 11

Officers were driving down Twin Lakes Road when they saw Defendant and his female companion, along with their dog, walking down the road. Their patrol was enforcing hunting, fishing, and trapping laws, as well as a host of other natural-resources type enforcement. They also were checking whether persons were in an open or closed area, and if they had the required permit. Defendant had an open beer in his hand and a handgun on his side. The officers thought they smelled marijuana, as their windows were down.[12] Officer Arnold and Ranger Priday made contact with Defendant. The following is taken primarily from the officer's body cam footage.

Defendant and the officers were very cordial. They discussed the weather and Defendant complained that someone had taken his usual camping spot. Defendant told officers he had spent three and a half years at nearby Fort Greely in the military police. Officers asked him for his RAP Pass, and Defendant said they did not have one. Ranger Priday explained that a RAP Pass was required to even enter the property, and asked Defendant how far away his camp was and if he had his ID on him. Defendant stated he did not have his ID and indicated it was at his camp, and that it was not far. Ranger Priday then walked with Defendant and his companion toward Defendant's truck while Officer Arnold followed them in the law enforcement truck. Officers did not ask for Defendant's sidearm during the walk. Defendant stated he had been in the area for many years but never had been required to have a RAP pass.

As they approached Defendant's vehicle, Ranger Priday asked him to place his handgun on the tailgate of the law enforcement truck.[13] Defendant placed the weapon on the

---

[12] Tr. 11.
[13] Ranger Priday testified that he was "offering him the opportunity" to place his handgun on the tailgate "without demanding it." However, Ranger Priday testified that he probably would not have allowed Defendant to keep his handgun at that point, if he had refused to place it on the tailgate. Tr. 32.

*United States v. Rodgers*     Case No. 4:23-cr-00022-RRB
Order Denying Motion to Suppress     Page 3
Case 4:23-cr-00022-RRB-SAO     Document 48     Filed 01/06/25     Page 3 of 11

tailgate and began walking towards his vehicle to retrieve his identification. While doing so, he stated, "I have two more guns in the vehicle." The officers followed Defendant and his companion to his pickup truck, and Defendant told officers the weapons were in the back of the vehicle. Defendant opened the driver's door, retrieved his wallet, and provided identification to the officers. They then asked Defendant the location of the other weapons, and he told them they were under the rear bench seat. The officer asked if the weapons were rifles or handguns, and Defendant told him there was one of each.

The officer asked Defendant to pull the weapons out, and simultaneously noted the smell of marijuana. After determining that the smell was CBD cigarettes, Defendant proceeded to retrieve the weapons. Defended entered the driver's door and then crawled between the two front seats to access the area under the rear seats. The officer was talking with Defendant's companion about marijuana and CBD, while Ranger Priday walked away from Defendant's vehicle to make a phone call to dispatch. Defendant handed the additional weapons to Officer Arnold who then took them to the tailgate of his truck. They put the rifle on safety and cleared the handgun. This was approximately thirteen minutes into the contact with Defendant.

After examining the rifle, Ranger Priday concluded the barrel on the rifle was illegally short. The officers also were concerned that one of the handguns had components from several manufacturers and a nearly illegible serial number. Ranger Priday testified that the officers returned to Defendant and told him his rifle was a short barrel and asked him if he had a tax stamp. Defendant said he did not. Defendant told Ranger Priday he realized the weapon was not legal in its current form and that he got it from a friend.[14] Officers told him he was on a federal facility

---

[14] Tr. 18. The video itself is unclear regarding this statement by Defendant, as the wind interfered with the recording.

with an illegal rifle. Defendant was on his phone attempting to sign up for a RAP pass. Officers asked for the companion's ID and returned to their vehicle to confer privately and discuss their options.

The officers concurred that they could not give the rifle back to Defendant. Officer Arnold pointed out that Defendant's possession of the short barrel rifle without paperwork was a felony. They discussed arresting and transporting Defendant and made further phone calls. Due to the felony offense on the rifle, Ranger Priday called dispatch and requested assistance from Alaska State Troopers. This was approximately twenty minutes after initiating contact with Defendant.

Ranger Priday then told Defendant not to worry about the RAP Pass, because the circumstances surrounding the rifle were more serious. Ranger Priday told Defendant he would have to leave the site regardless, once this was resolved, but he did not know how the encounter would end. Ranger Priday then told Defendant to "hang tight" and stay at the front of the vehicle. Officers contacted or attempted to contact several law enforcement agencies to determine whether to just confiscate the rifle or to also arrest Defendant, and for information regarding handling the short barrel rifle and the handgun, which they suspected may be a "ghost gun." Noting that Defendant was in the Alaska National Guard, they also contacted military law enforcement at the Army bases in Alaska. The officers discussed, at length, the logistical issues of an arrest given their remote location and lack of transportation options.

A little over an hour after first contact, both Defendant and his companion were still standing in front of their truck. Ranger Priday first told the woman that she could not sit inside the vehicle, but then reconsidered and told her that if she would allow him to search that area of the truck then he would allow her to sit in the truck. They both gave their authorization for Ranger

Priday to search the passenger area of the vehicle, and a brief search of the seated area and floorboards adjacent to the front passenger seat, as well as the floor of the rear passenger compartment, revealed a high-capacity rifle magazine, but nothing else of concern. Defendant remained standing outside of the truck.

Military law enforcement from Fort Greely arrived, and the officers continued to confer. Approximately an hour and eight minutes into the contact, officers asked Defendant if he would consent to sobriety tests to ensure that he was sufficiently sober to drive out if released. Defendant agreed. Defendant passed the field sobriety test at approximately one hour and fifteen minutes into the contact.

Additional time passed, the officers and the couple discussed the weather, the dog, and Defendant's companion asked permission to use the restroom. Ranger Priday allowed her to do so. Officer Arnold and Ranger Priday continued to confer with other agencies and the officer from Fort Greely at the scene. At approximately one hour and twenty-two minutes into the contact, officers confirmed that the Alaska State Troopers were *en route*.

"[B]oth Fort Greely and Fort Wainwright were unable and unwilling to hold [Defendant] in their holding facilities."[15] At approximately one hour and forty-three minutes into the contact, a Fort Greely police officer relayed to the officers that the Alaska State Troopers told him they would not take the matter because the offense had occurred on federal land. The officers then conferred again and ultimately decided not to arrest Defendant, but to confiscate the rifle and cite both individuals for trespass. At about one hour and fifty-one minutes into the contact, Ranger Priday placed the two handguns into the back of Defendant's vehicle. Officer Arnold continued to get personal information from Defendant's companion. Ranger Priday took the rifle and the

---

[15] Tr. 19.

*United States v. Rodgers*  Case No. 4:23-cr-00022-RRB
Order Denying Motion to Suppress  Page 6
Case 4:23-cr-00022-RRB-SAO   Document 48   Filed 01/06/25   Page 6 of 11

magazine and placed them into the back of his law enforcement vehicle. At approximately one hour and fifty-five minutes into the contact, Ranger Priday gave both individuals citations for trespassing without a RAP Pass and again told Defendant that he may be charged at a later date for possession of the illegal firearm. Ranger Priday told Defendant that drinking while in possession of a firearm was not advised. He instructed them to leave the premises.

Approximately five months later, Defendant was indicted in this matter for possession of an unregistered firearm.

### III. DISCUSSION

Defendant argues that his Fourth Amendment rights were violated by the expansion of the *Terry* stop to include a warrantless search of his vehicle. But the government argues that Defendant was "illegally trespassing on a military installation and [that he] consented to the search by handing over his weapons from his vehicle. Additionally, by virtue of being on a military installation he is subject to warrantless searches."[16]

*Terry* stops permit an officer to "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."[17] Courts have declined to impose rigid time limitations on *Terry* stops.[18] However, *Terry* stops must have a limited scope and duration.[19] Defendant argues that the officers in this case exceeded these limitations when they told him to retrieve the guns from his vehicle, "as doing so was unrelated to the purposes of the stop, increased the duration of his detention, and fell outside the scope of their mission" to cite

---

[16] Docket 30 at 1, 8 (citing *Morgan v. United States*, 323 F.3d 776, 782 (9th Cir. 2003)).
[17] *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).
[18] *See Gallegos v. City of Los Angeles*, 308 F.3d 987, 992 (9th Cir. 2002) (finding that 45 minutes to an hour was reasonable).
[19] *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion) ("The scope of the detention must be carefully tailored to its underlying justification.").

*United States v. Rodgers*     Case No. 4:23-cr-00022-RRB
Order Denying Motion to Suppress     Page 7
Case 4:23-cr-00022-RRB-SAO     Document 48     Filed 01/06/25     Page 7 of 11

him for failing to have a RAP Pass.[20] He argues that the officers' objective was only to cite him for trespassing without a RAP pass, and that any search that occurred beyond the time necessary to do so was in violation of *Terry*.[21]

The Supreme Court has explained that "[b]ecause addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.' . . . Authority for the seizure thus ends when tasks tied to the . . . infraction are—or reasonably should have been—completed."[22] The officers' initial concern that Defendant was armed and drinking, as well as the perceived smell of marijuana, was compounded by the lack of a permit to be on the federal property. The stop was necessarily extended as the parties walked to Defendant's vehicle to retrieve his identification. Defendant argues that the officers detained him longer than was necessary to cite him for trespass, but he *volunteered* the information about additional firearms before he had even produced his identification, only 7 minutes and 30 seconds from initial contact.[23] The weapons that Defendant seeks to suppress were produced approximately 10 minutes after first contact, well within a reasonable timeframe for a *Terry* stop. The Court cannot find that the length of time from first contact until the discovery of the allegedly illegal firearm was unreasonable or in violation of *Terry*.

With respect to the legitimacy of the "search" that resulted in the discovery of two firearms, the Ninth Circuit has held that "a warrantless search of a person seeking to enter a military

---

[20] Docket 26 at 6 (citing *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)).
[21] Docket 26.
[22] *Rodriguez*, 575 U.S. at 354 (internal citations omitted).
[23] Alaska law requires an individual who possesses a deadly weapon concealed on his person to immediately inform a peace officer of such possession upon contact. Alaska Stat. § 11.61.220(a)(1)(A)(i). "Concealed on the person" does not include a firearm concealed under the seat of a vehicle, or otherwise hidden in the vehicle. *DeNardo v. State*, 819 P.2d 903, 907 (Alaska App. 1991) (citing Commentary on the Alaska Revised Criminal Code, Senate Journal Supp. No. 47 at 103, 1978 Senate Journal 1399.).

base *may* be deemed reasonable based on the implied consent of the person searched," but that there is not a "categorical exception to the probable cause rule for all searches on closed military bases"[24] "[T]he probable cause requirement is only obviated if the defendant impliedly consented to the search," and whether such implied consent exists depends on the facts of the case.[25]

The Court concludes, however, based on a review of the evidentiary hearing and the body camera footage, that no search occurred here. Therefore, the military exception regarding warrantless searches need not be more specifically addressed. In this case, law enforcement did not discover the weapons via a search. Rather, Defendant, who was not in custody at the time, voluntarily disclosed the existence of additional weapons, and obtained them from his vehicle at the officers' request. Even if this series of events could be characterized as a "search," Defendant's behavior in disclosing the weapons and retrieving them from the vehicle without objection implies consent.[26] The Ninth Circuit has "identified several factors to be considered in determining whether consent to search was voluntary. Among the factors that tend to show a lack of voluntariness are: (1) the person was in custody; (2) the officer had his weapon drawn; (3) the officer failed to administer *Miranda* warnings; (4) the officer did not inform the person of his right to refuse to consent; and (5) the person was told that a search warrant could be obtained."[27] "[I]t is not necessary for all five factors to be satisfied in order to sustain a consensual search."[28]

---

[24] *Morgan v. United States*, 323 F.3d 776, 778 (9th Cir. 2003) (emphasis added).
[25] *Id.*
[26] Officer Priday testified that if Defendant had declined to produce the weapons from inside the vehicle, he would "have him relocate somewhere so I could create distance between him and the vehicle." Tr. 17.
[27] *United States v. Chan-Jimenez*, 125 F.3d 1324, 1327 (9th Cir. 1997).
[28] *United States v. Cormier*, 220 F.3d 1103, 1113 (9th Cir. 2000).

In this case, Defendant was not in custody and the officers did not have weapons drawn.[29] The Ninth Circuit previously has determined that these two facts alone were sufficient to support a finding that a defendant consented to the entry and search of his motel room.[30] Moreover, as a former military police officer, Defendant presumably was fully aware of his rights. The Ninth Circuit has held that prior experience with law enforcement "increases the likelihood that [Defendant] was already aware of his rights to refuse consent and to remain silent."[31]

Finally, although the Court finds that the *Terry* stop was reasonable, the Court finds that the *Terry* stop ended when the officers began seeking assistance from multiple law enforcement agencies to facilitate Defendant's arrest.[32] Once the weapon was voluntarily disclosed and produced, the officers had a new objective: handling a Class A felony in a remote location. Matters were further complicated by circumstances occurring after hours, on a Sunday of a holiday weekend. The officers discussed, on the body camera recording, that they had to do "due diligence" to find a law enforcement agency to take custody of Defendant if he was arrested. They discussed with a Fort Greely military police officer who visited the scene that they were dealing with an illegal firearm, and that it was "unusual" to let a Class A felony involving a firearm leave without an arrest. Ranger Priday testified at the evidentiary hearing that "at that point, with a felony firearms violation in our presence we -- you know, you would typically make an arrest. However, the Fish and Wildlife and BLM are both small agencies. We rely on the marshals in

---

[29] Prior to the discovery of the illegal firearm, there was no reason for *Miranda* warnings or a search warrant.
[30] *Cormier*, 220 F.3d at 1113.
[31] *Id.*
[32] Despite the cordial nature of the circumstances, Defendant clearly was not free to leave once he had produced the illegal firearm. He was told to remain in front of his vehicle. His companion had to ask permission to use the restroom, or to sit in the vehicle. According to their testimony, had the officers been able to reach any entity willing to assist in transporting and holding Defendant, he would have been arrested.

order to arrest people and take them to FCC. We were unable to reach the marshals on Sunday night. We were unable to reach the Bureau of Alcohol and Tobacco and Firearms as well. And both Fort Greely and Fort Wainwright were unable and unwilling to hold Mr. Rodgers in their holding facilities. So, we elected not to arrest at that point."[33] Accordingly, the Court finds that following the production of the illegal firearm, Defendant was detained while the officers attempted to get assistance with an arrest.[34] Accordingly, this time period, spanning more than 90 minutes, was not subject to the time restrictions of a *Terry* stop.

While Defendant included a single sentence in his motion arguing that "any statements made by him" after the seizure of the weapon should be suppressed,[35] no authority is provided for such relief. Defendant voluntarily engaged in random and unsolicited conversation with law enforcement throughout. He was not being interrogated nor responding to questions, and there was no reason to silence him. The statements, therefore, will not be supprerssed.

## IV. CONCLUSION

In light of the foregoing, the Motion to Suppress at Docket 26 is DENIED.

IT IS SO ORDERED this 6th day of January, 2025, at Anchorage, Alaska.

                                                    */s/ Ralph R. Beistline*
                                                   RALPH R. BEISTLINE
                                                   Senior United States District Judge

---

[33] Tr. 19.
[34] *See Florida v. Royer*, 460 U.S. 491, 501–02 (1983) (plurality) (holding that a defendant was seized when identified law enforcement officials told him he was under investigation and retained his driver's license).
[35] Docket 26 at 17.

*United States v. Rodgers*                                                 Case No. 4:23-cr-00022-RRB
Order Denying Motion to Suppress                                          Page 11
Case 4:23-cr-00022-RRB-SAO     Document 48     Filed 01/06/25     Page 11 of 11